IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
:
NATIONAL STARCH AND CHEMICAL :
INVESTMENT HOLDING CORPORATION, :
PENFORD AUSTRALIA LTD. and :
PENFORD HOLDINGS PTY, :
:
:
Plaintiffs, :
:
v. : Civil Action No. 04-1443-GMS
:
CARGILL CORPORATION and :
MGP INGREDIENTS, INC. :
Defendants. :
:
------------------------------------------------------------x

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

Josy W. Ingersoll (ID #1088)
Karen E. Keller (ID #4489)
YOUNG CONAWAY STARGATT &
   TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6672
jingersoll@ycst.com
*Attorneys for Plaintiffs National Starch and Penford*

OF COUNSEL:

Richard L. DeLucia
Paul M. Richter, Jr.
KENYON & KENYON
One Broadway
New York, NY 10004
(212) 425-7200

Dated: September 26, 2005

# TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................................. 2

II. BACKGROUND OF THE ASSERTED '454 AND '840 PATENTS ............................................................................................................. 3

    A. General Description of the Technology of the '454 and '840 Patents and the Subject Matter of the Asserted Claims ................................................................................................ 3

    B. Specific Discussion of the Asserted Claims ............................................ 5

III. ARGUMENT ......................................................................................................... 7

    A. Each Claim Term Should Be Given Its Ordinary And Accustomed Meaning .................................................................................. 7

    B. Plaintiffs' Proposed Claims Constructions ............................................. 10

        1. "Amylose Content" and "Apparent Amylose Content" ............... 11

        2. Other Claim Terms ........................................................................ 11

IV. CONCLUSION .................................................................................................... 13

# TABLE OF AUTHORITIES

**Page**

**Cases**

*CCS Fitness, Inc. v. Brunswick Corp.*
    288 F.3d 1359 (Fed. Cir. 2002) ............................................................................. 9

*E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*,
    849 F.2d 1430 (Fed. Cir. 1988) ............................................................................. 9

*Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*,
    350 F.3d 1327 (Fed. Cir. 2003) ............................................................................. 8

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
    381 F.3d 1352 (Fed. Cir. 2004) ............................................................................. 8

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
    381 F.3d 1111 (Fed. Cir. 2004) ............................................................................. 8

*Interactive Gift Express, Inc. v. Compuserve, Inc.*
    256, F.3d 1323 (Fed. Cir. 2001) ............................................................................. 7

*Intervet America, Inc. v. Kee-Vet Labs.*,
    887 F.2d 1050 (Fed. Cir. 1989) ............................................................................. 9

*Johnson Worldwide Assoc., Inc. v. Zebco Corp.*,
    175 F.3d 985 (Fed. Cir. 1999) ............................................................................. 7, 9

*Markman v. Westview Instruments,*
    *Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc),
    aff'd, 517 U.S. 370 (1996) ............................................................................. 7, 8

*PC Connector Solutions LLC v. SmartDisk Corp.*,
    406 F.3d 1359 (Fed. Cir. 2005) ............................................................................. 8

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................................................................. 7, 8

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ............................................................................. 8

*Schering Corp. v. Amgen Inc.*,
    222 F.3d 1347 (Fed. Cir. 2000) ............................................................................. 8

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985) ............................................................................. 9

*Superguide Corp. v. DirecTV Enterprises, Inc.*,
   358 F.3d 870 (Fed. Cir. 2004) ............................................................................. 7

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002) ........................................................................... 7

*Toro Co. v. White Consol. Indus., Inc.*,
   199 F.3d 1295 (Fed. Cir. 1999) ........................................................................... 8

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ............................................................................. 8

## STATUTES

35 U.S.C. § 112 ............................................................................................................ 9

Plaintiffs, National Starch and Chemical Investment Holding Corporation ("National Starch"), Penford Australia Ltd. ("Penford Australia"), and Penford Holdings Pty. ("Penford Holdings" and collectively, with Penford Australia, referred to herein as "Penford"), hereby jointly provide their opening claim construction brief directed to the asserted claims in Penford's U.S. Patent Nos. 5,977,454 ("the '454 patent," Exhibit 1 hereto) and 6,409,840 ("the '840 patent," Exhibit 2 hereto).

I.  **INTRODUCTION**

This is a simple case for claims construction purposes. The claim terms are straightforward, clear and understandable on their own. Indeed, there is only one claim term in each of the two asserted patents that defendants even argue needs to be construed, namely "amylose content" in the '454 patent and "apparent amylose content" in the '840 patent. The remaining terms in the eighteen total claims of the '454 and '840 patents admittedly are entitled to their ordinary and accustomed meanings to a person of ordinary skill in the art, without further interpretation. The two, supposedly disputable claim terms are likewise easily understood by one of such skill reading the patents-in-suit, which stem from the same original application and share the same specification. In short, the asserted claims mean what they say.

The inventions of the patents-in-suit concern hybrid maize seeds and plants, which can be processed into "high amylose" starch used in making end products in the food industry, for example. Amylose is a linear polymer and its "content" is a measure of its percent by weight in the starch recited in the claims of the '454 and '840 patents. Amylose content is important to the inventions of these patents since its presence at elevated levels (above 80% by weight) in maize starch imparts advantageous physical properties (*e.g.*, increased tensile strength) to end products made from that starch, such as food packaging films.

The shared specification of the '454 and '840 patents states that "[f]or the purposes of the description of the invention, the method by which amylose was determined is set out below." *See* Exhibit 1 at col. 3, lns. 6-7. That method is described as a method for determining "Apparent Amylose" (col. 3, ln. 8), and then it is set forth in detail in columns 3 and 4. The results of that test for "amylose content" are reported as constituting the "apparent amylose content" of the starch. *See* Exhibit 1, Table 1, at col. 9. The reason for that is plain -- one cannot determine amylose content merely by looking at a maize seed or starch. Rather, a

test must be applied to determine the amylose content that is "apparent" from that test. Thus, "amylose content" as used in both patents refers to the "apparent amylose content" of the starch, as one of ordinary skill in the art would determine it from the patents (and, of course, "apparent amylose content" means the same thing).

Defendants, in contrast, proffer a construction of these terms that is divorced from the language of the claims and the patents. They state that both "amylose content" (in the '454 patent's claims) and "apparent amylose content" (in the '840 patent's claims) mean amylose content as determined by an undefined, generic "colorimetric iodine analysis." Defendant's position no doubt foreshadows some presently-undisclosed, but carefully crafted test they hope to import into the claims to distort them and escape their embrace. This is not a proper exercise in claim construction, but a classic effort by accused infringers to rewrite claims for their own purposes. It should be flatly rejected.[1]

## II.    BACKGROUND OF THE ASSERTED '454 AND '840 PATENTS

### A.    General Description of the Technology of the '454 and '840 Patents and the Subject Matter of the Asserted Claims

Plaintiffs' asserted patents in this case are directed to hybrid maize seeds containing starch having an amylose content of greater than 80% by weight and high amylose starch derived from such hybrid seeds. Amylose is a linear polymer, meaning that it is a molecularly straight compound as opposed to one that is branched (like a tree). The higher content of these linear molecules in starches having amylose contents above 80% by weight imparts desirable physical properties in products (like films) made from them, akin to those of synthetic plastics. For example, food packaging films made from the starches of the invention have increased tensile strengths and are good oxygen barriers. Another advantage is that these inventive starches are easier to process and handle on conventional synthetic plastics materials

---

1    Plaintiffs' understanding of defendants' claim construction position at this time is based on the joint claim

equipment, such as injection molding or blow molding machines. *See* Exhibit A at col. 7, lns. 5-15.

Prior to Penford's patented inventions, maize seed and starch having amylose contents above 80% by weight were not achieved in the art, either naturally or through seed hybridization efforts. Penford's scientists created a breeding program to develop a hybrid maize seed containing a particular gene, called the ae amylose extender gene. That gene advantageously elevated the amylose content of the starch contained in seed having the gene. Penford demonstrated that the starch derived from the maize they developed has amylose contents above 80% by weight. *See id.* at col. 1, lns. 27-67.

Penford filed two Australian patent applications on these inventions in 1992 and 1993. Those applications formed the basis for U.S. Application Serial No. 08/374,645 ("the '645 application"), filed in the United States Patent & Trademark Office ("the PTO") on July 30, 1993. Each of the '454 patent (issued November 2, 1999) and the '840 patent (issued June 25, 2002) ultimately stems from that same '645 application, as does another patent, U.S. Patent No. 5,714,600 ("the '600 patent), that is not asserted in this case. Those three patents are part of the same patent family and all share the same specification. Their respective claims, however, are different. The claims of the '454 patent are directed to hybrid maize seeds carrying the ae amylose extender gene and containing starch having an amylose content of greater than 80% by weight, as well as viable maize seeds and plants of the same type. The claims of the '840 patent are directed to maize starch having an apparent amylose content of more than 90.1% and compositions comprising maize starch of the same apparent amylose content.

Penford later licensed the '454 and '840 patents to National Starch, exclusively in the field of Human Nutrition. Both Penford and National Starch have the right under that license to sue for infringement of the '454 and '840 patents and seek and collect monetary and other

---

construction chart the parties filed with the Court on September 14, 2005.

damages for that infringement, which they are doing here against the defendants, Cargill Corporation ("Cargill") and MGP Ingredients, Inc., ("MGPI").

Cargill and MGPI are infringing the '454 and '840 patents by making and selling high amylose starch products derived from maize seeds containing starch having an amylose content above 80% by weight. More specifically, Cargill and MGPI are selling starch products (including products under the designation "FiberSym™ HA") that embody the patented invention of the '840 patent and are derived from high amylose corn seed and plants, which were developed and grown by or on behalf of Cargill and embody the patented invention of the '454 patent. Defendants' infringing products exploit the desirable properties of plaintiffs' inventive seed and starch described above.

### B. Specific Discussion of the Asserted Claims

All of the claims in each of the '454 and '840 patents are being asserted in this case. Every one of defendants' accused products and activities does not infringe each of those asserted claims, however. The corn and seed grown by Cargill, for example, infringe the asserted claims of the '454 patent, while the high amylose starch products that defendants derive from those corn seed and plants infringe the claims of the '840 patent.

The '454 patent contains thirteen claims, including three independent claims that are reproduced below:

> 1. Hybrid maize seed carrying recessive ae amylose extender gene and containing starch having an amylose content of greater than 80% by weight.
>
> 8. Hybrid maize seed carrying recessive ae amylose extender gene deposited under ATCC Accession No. 75182.
>
> 10. Viable maize seeds and plants and succeeding generations thereof grown from seeds deposited under ATCC Accession No. 75182, and maize seeds and plants carrying recessive ae amylose extender gene transferred from the deposited seeds and capable of producing starch having an amylose content of greater than 80% by weight.

Exhibit 1 at col. 10.

Each of claims 2 through 7 depends directly from claim 1 and recites higher amylose contents (claims 2-4) for the starch than specified in claim1, further specifies that the hybrid maize seed was produced by crossing inbred maize plants carrying the ae amylose extender gene (claim 5), further specifies that the hybrid maize seed was produced from F1 maize plant hybrids (claim 6) or further recites that the hybrid maize seed has all of the characteristics of ATCC Accession No. 75182 (claim 7). *See id.*

Claim 9 depends directly from claim 8 and recites maize plants grown from the hybrid maize seeds of claim 8. *See id.*

Each of claims 11 through 13 depends directly from claim 10 and recites higher amylose contents for the starch than specified in claim 10. *See id.*

The '840 patent contains five claims, including two independent claims that are reproduced below:

> 1.  A maize starch selected from the group consisting of maize starch having an apparent amylose content of more than 90.1%, physically or chemically modified derivatives of maize starch having an apparent amylose content of more than 90.1%, destructurized maize starch having an apparent amylose content of more than 90.1%, and non-destructurized maize starch having an apparent amylose content of more than 90.1%.
>
> 4.  A composition comprising a maize starch selected from the group consisting of maize starch having an apparent amylose content of more than 90.1%, physically or chemically modified derivatives of maize starch having an apparent amylose content of more than 90.1%, destructurized maize starch having an apparent amylose content of more than 80%, and non-destructurized maize starch having an apparent amylose content of more than 90.1%.

Exhibit 2 at col. 10.[2]

---

[2] Each of the claims in the '840 patent recites a maize starch or composition "selected from the group consisting of," and then lists the members of that group. This is called a "Markush group" in claim drafting parlance, and it is black letter patent law that one meets such a claim element by having any *single* member listed in the group (not all). *See, e.g.,* Manual of Patent Examining Procedure at § 2173.05(h) (2004).

Each of claims 2 and 3 depends directly from claim 1 and recites higher apparent amylose contents for the maize starch than specified in claim 1. Claim 5 depends directly from claim 4 and recites a higher apparent amylose content for the maize starch than specified in claim 4. *See id.*

III.  **ARGUMENT**

  A.  **Each Claim Term Should Be Given Its Ordinary And Accustomed Meaning**

The first step in a patent infringement analysis, namely claim construction, is solely a question of law that must be resolved by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). However, "construing" a patent claim does not properly involve changing its plain meaning, as an accused infringer (such as Cargill and MGPI, here) often urges in the hope of escaping the embrace of a claim it infringes.

To the contrary, construction of a claim starts with its plain language and, in the absence of some "compell[ing]" reason not to, this Court "must presume that the terms in the claim[s] mean what they say, and . . . give full effect to the ordinary and accustomed meaning of claim terms." *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999); *see also Superguide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 874 (Fed. Cir. 2004); *and Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). Indeed, in properly construing patent claims, the central focus in all phases of analysis is the language of the claims themselves. *Interactive Gift Express, Inc. v. Compuserve, Inc.* 256, F.3d 1323, 1331 (Fed. Cir. 2001).

The Federal Circuit recently confirmed these bedrock claim construction principles, *en banc*, in the case of *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), noting that "[w]e have frequently stated that the words of a claim 'are generally given their ordinary and

customary meaning.'" *See id.* at 1313 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

Moreover, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *See* Phillips, 415 F.3d at 1314; *see also Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). ("A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention."); *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("customary meaning" refers to the "customary meaning in [the] art field"); *Ferguson Beauregard/Logic Controls v. Mega Sys., LLC,* 350 F.3d 1327, 1338 (Fed. Cir. 2003) (claim terms "are examined through the viewing glass of a person skilled in the art"); *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) (meaning of claim "must be interpreted as of [the] effective filing date" of the patent application); *Schering Corp. v. Amgen Inc., 222 F.3d 1347, 1353 (Fed. Cir. 2000)* (same).

"The claims, of course, do not stand alone, [but] are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims [and] [f]or that reason, claims 'must be read in view of the specification, of which they are a part.'" *Phillips,* 415 F.3d at 1315 (citing *Markman,* 52 F.3d at 978-79*).* Yet, while it oft has been said that claims are to be viewed in light of a patent's specification (the body of a patent) and prosecution history in the PTO (together, referred to as the "intrinsic evidence"), that is not a license to use the claim construction exercise to import limitations into a claim that do not otherwise exist in its plain language. As the Federal Circuit explained:

> [T]his court has consistently adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification will not be read into claims, and that interpreting what is *meant* by a word *in* a claim "is not to be confused with adding an extraneous limitation appearing in the specification, which is improper."

*Intervet America, Inc. v. Kee-Vet Labs.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989) (emphasis in original) (quoting *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)). Rather, it is the claims themselves that must govern when defining the invention:

> If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as the specification-described embodiment is operated, there would be no need for claims. Nor could an applicant, regardless of the prior art, claim more broadly than that embodiment. Nor would a basis remain for the statutory necessity that an applicant conclude his specification with claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. 35 U.S.C. § 112. It is the claims that measure the invention.

*SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

For all of these reasons, a "*heavy presumption*" applies in favor of according a patent claim its "ordinary and accustomed meaning" (*see Johnson*, 175 F.3d at 989; *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). Indeed,

> [C]laim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invites reference to those sources. 'If we once begin to include elements not mentioned in the claim in order to limit such claim . . . we should never know where to stop.' In other words, *there must be a textual reference in the actual language of the claim with which to associate a proffered claim construction.*

*Johnson*, 175 F.3d at 989-990 (citations omitted and emphasis added). There simply is no such "textual reference" or invitation in the language of the asserted claims of the '454 or '840 patents that warrants changing the meaning of those claims from that which is plain from their words

alone, much less importing into those claims *any colorimetric iodine analysis test* that defendants might design to try to escape infringement.

### B.  Plaintiffs' Proposed Claims Constructions

The claims of the '454 patent are directed to hybrid maize seeds carrying the ae amylose extender gene and containing starch having an amylose content of greater than 80% by weight, as well as viable maize seeds and plants of the same type. The claims of the '840 patent are directed to maize starch having an apparent amylose content of more than 90.1% and maize starch compositions of the same apparent amylose content. The terms "amylose content" and "apparent amylose content" both refer to the amylose level that is apparent in the seed or starch as determined in the patent by one of ordinary skill in the art. *See, e.g.,* cols. 3 & 4 and Table 1, col. 9 of Exhibits 1 & 2.

Thus, the seeds, plants, starches and starch compositions of these two patents are defined in a straightforward and self-explanatory manner, using well-known terms in the relevant art and everyday English. The asserted claims should be construed to have their ordinary and accustomed meanings to a person of ordinary skill in the art, as set forth above. That should end the claims construction analysis. However, notwithstanding the clarity of each asserted claim's meaning from its words alone, plaintiffs provide below the following further confirmation of the plain meaning of certain claim terms through reference to the shared specification of the '454 and '840 patents.

1.  **"Amylose Content" and "Apparent Amylose Content"**

The terms "amylose content" and "apparent amylose content" are simple, clear and at the center of the claimed inventions. Claim 1 of the '454 patent specifies that the hybrid maize seed must contain starch "having an amylose content greater than 80% by weight." Claim 1 of the '840 patent recites a maize starch having an "apparent amylose content of more than 90.1%."

The shared specification of these two patents states, moreover, that "[f]or the purposes of the description of the invention, the method by which amylose was determined is set out below." *See* Exhibit 1 at col. 3, lns. 6-7. That method is described as a method for determining "Apparent Amylose" (col. 3, ln. 8 of Exhibit 1), and then the method is set forth in detail in columns 3 and 4 of both patents. The results of that method for determining "amylose content" are reported as constituting the "apparent amylose content" of the starch. *See* Exhibit 1, Table 1, at col. 9. This makes perfect sense, since the test determines the amylose content that is "apparent" from the results of that test (as in Table 1). Thus, "amylose content" as used in the '454 patent refers to the "apparent amylose content" of the starch as one of ordinary skill in the art would determine it from the patent (and "apparent amylose content" in the '840 patent means the same thing).

2.  **Other Claim Terms**

The remaining claim terms in the '454 and '840 patents are likewise clear on their own, and therefore entitled to a construction embracing their "ordinary and accustomed meaning" in the art.

All claims of the '454 patent recite that the hybrid maize seed carries a "recessive ae extender gene." Claim 5 of the '454 patent states that the hybrid maize seed is produced by "crossing inbred maize plants carrying the ae amylose extender gene," and claim 6 of that patent

recites that the hybrid maize seed is "produced from F1 maize plant hybrids." *See* Exhibit 1 at col. 10. Each of these terms is plain on its own and readily understood by one of ordinary skill in the art, without further interpretation. The specification of the '454 patent confirms this truth, clearly explaining a breeding program of the inventors that resulted in plants and seeds carrying the ae amylose extender gene, as well as the use of the F1 hybrids and development of inbred lines as part of that program. *See* Exhibit 1 at, e.g., col. 1, lns. 45-50 and col. 4, ln. 53 to col. 5, ln. 5.

Claims 7 through 13 of the '454 patent recite a seed carrying the ae amylose extender gene that "was deposited under ATCC Accession No. 75182. *See* Exhibit 1 at col. 10. That language could not be any clearer, as it refers to a particular seed deposit by number (and its "characteristics" – claim 7). Moreover, the specification of the '454 patent confirms a breeding program that led to this seed and its deposit under that particular numerical designation. *See* Exhibit 1 at, *e.g.*, col. 1, lns. 45-50 and col. 4, ln. 53 to col. 5, ln. 5.

The '840 patent's claims define maize starches and maize starch compositions as selected from the "group consisting of" four members. As explained above, this is alternative language and having any single one of those four members is sufficient alone to meet the group recited in the claims (it does not require having all four members – or even more than one). Moreover, the members of the group are defined in straightforward, plain language as "maize starch," "physically or chemically modified derivatives of maize starch, "destructurized maize starch," and "non-destructurized maize starch." *See* Exhibit 2 at col. 10. These terms are well-known chemical and physical descriptions of the starch to those of ordinary skill in the art, and need no further interpretation. In any case, the specification describes and confirms these clear descriptions to one of ordinary skill in the art. *See* Exhibit 2 at, e.g., col 1.

IV. **CONCLUSION**

For all of the above reasons, the asserted claims of the '454 and '840 patents should be construed to have their ordinary and accustomed meanings to one of ordinary sill in the art, with the terms "amylose content" and "apparent amylose content" construed in that regard to mean the apparent amylose content determined in the patent by one of such skill.

                YOUNG CONAWAY STARGATT &
                TAYLOR, LLP

                Josy W. Ingersoll (ID #1088)
                Karen E. Keller (ID #4489)
                The Brandywine Building
                1000 West Street, 17th Floor
                Wilmington, Delaware 19801
                (302) 571-6672
                jingersoll@ycst.com
                *Attorneys for Plaintiffs National Starch and Penford*

OF COUNSEL:

Richard L. DeLucia
Paul M. Richter, Jr.
KENYON & KENYON
One Broadway
New York, NY  10004
(212) 425-7200

## CERTIFICATE OF SERVICE

I, Josy W. Ingersoll, Esquire, hereby certify that on September 26, 2005, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

>Thomas Lee Halkowski, Esquire
>Fish & Richardson PC
>919 North Market Street, Suite 1100
>Wilmington, DE 19801

I further certify that on September 26, 2005, I caused a copy of the foregoing document to be served by hand delivery on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL**

>Gregory Madera, Esquire
>Fish & Richardson P.C.
>225 Franklin Street
>Boston, MA 02110

>YOUNG CONAWAY STARGATT & TAYLOR, LLP

>Josy W. Ingersoll (No. 1088)
>Karen E. Keller (No. 4489)
>The Brandywine Building
>1000 West Street, 17th Floor
>Wilmington, Delaware 19801
>(302) 571-6600
>jingersoll@ycst.com

>Attorneys for Plaintiffs

DB01:1593597.1