# FISH & RICHARDSON P.C.

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

Suite 1100
919 N. Market Street
P.O. Box 1114
Wilmington, Delaware
19899-1114

Telephone
302 652-5070

Facsimile
302 652-0607

Web Site
www.fr.com

April 5, 2006

**REDACTED**

The Honorable Gregory M. Sleet
United States District Court
for the District of Delaware
844 King Street, Room 4324
Wilmington, DE 19801

Re:   *National Starch and Chemical, et al. v. Cargill, Inc., et al.*
      C.A. No. 04-1443-GMS

Dear Judge Sleet:



ATLANTA
AUSTIN
BOSTON
DALLAS
DELAWARE
NEW YORK
SAN DIEGO
SILICON VALLEY
TWIN CITIES
WASHINGTON, DC

Pursuant to the Court's Scheduling Order of April 29, 2005 (D.I. 25), Defendants Cargill, Inc. and MGP Ingredients, Inc. request permission to file Motions for Summary Judgment regarding the issues below. This is a unique case where documents produced from the Plaintiffs' own files show beyond any doubt that the patents-in-suit are invalid. Both patents are fatally defective and the Court should summarily adjudicate them as invalid.

Plaintiffs Penford Australia Ltd and Penford Holdings PTY ("Penford") own the Patents-in-suit, U.S. Patent Nos. 5,977,454 ("'454 patent) and 6,409,840 ("'840 patent"). Plaintiff National Starch and Chemical Investment Holding Corporation ("National Starch") is the exclusive licensee of the patents-in-suit within a limited field.

The asserted claims of the '454 patent cover hybrid maize *seed* carrying a recessive amylose extender ("ae") gene, and which contain starch having greater than 80% amylose content by weight. The claims of the '840 patent cover various maize *starches* having an apparent amylose content of more than 90.1%. The patents-in-suit are related. They are divisions from a common parent application, and have the same specification. The accused starches are made from grain grown from the accused hybrid seeds.[1]

I.  **Patent Invalidity**

    *A. Multiple Errors Exist In The "Blue Value" Test As Set Forth In The Patents*

During the claim construction process, Plaintiffs argued repeatedly that the specific amylose content percentages set forth in the claims had to be measured using the precise "Blue Value" test of the patents' shared specification. The Court subsequently construed the claim terms "amylose content" and "apparent amylose content" to mean "amylose

---

[1] Shortly before the due date for opening expert reports, Plaintiffs advised Defendants that they were no longer asserting the '840 patent. Up to then the starches Cargill sells to MGPI had been the focus of the dispute. However, Plaintiff Cargill has pending declaratory judgment counterclaims of invalidity and unfair competition (for knowingly asserting invalid and unenforceable patents). Plaintiffs, thus, seek summary judgment as to certain issues concerning validity of both patents-in-suit. In fact, both patents are invalid for the same reasons.

FISH & RICHARDSON P.C.

The Honorable Gregory M. Sleet
April 5, 2006
Page 2

content determined by the Blue Value method described in . . . the '840 patent, or . . . the '454 patent." (D.I. 45)

Discovery has revealed that the "Blue Value" test recited in the patents is *not* the test actually used by the inventors to determine the amylose content of their allegedly inventive "Code 008" seed and starch.

**REDACTED**

These undisputed errors in the test method as stated in the patents render the patent claims invalid for failure to comply with multiple provisions of 35 U.S.C. § 112, including all requirements of paragraphs one and two. For example, the patents state explicitly, "For the purpose of the description of the invention, the method by which amylose was determined is set out below." '454 Patent

FISH & RICHARDSON P.C.

The Honorable Gregory M. Sleet
April 5, 2006
Page 3

Column 3, Lines 5-6 (emphasis added). This statement is simply untrue.  REDACTED

See 35 U.S.C. § 112(1), (2) ("The specification shall contain a written description of the invention, and of the manner and process of making and using it . . .." "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.").

The errors are far from trivial, as they greatly expand the patentee's claim scope. See 35 U.S.C. § 112 (requiring a written description of the invention "in such full clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use same").

REDACTED

B.     *Plaintiffs <u>Own</u> Documents Confirm that the Patents' Test Results in Non-Reproducible Results*

REDACTED

Since the test is not reproducible between labs, members of the public cannot reliably determine whether or not they are infringing the patents. The patents are therefore invalid as indefinite. *See Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1340-42 (Fed. Cir. 2003) (invalidating claims as indefinite because the method of testing could not give reliable results).

---

[2] The ten-fold error in the amount of sodium hydroxide to be used during the test, standing alone, also renders the patents invalid. *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371 (Fed. Cir. 2004) (Instruction to heat dough "to" 800° is binding on patentee even if persons skilled in the art would realize it should have read "at" 800°).

[3] As just one example, the method of the patent at step 1 instructs to weigh anywhere between 100 mg and 105 mg of the starch sample to be tested. Penford's 1997 Laboratory Report identifies this as one possible reason the test is non reproducible. A given scientist may elect to start with 100 mg of sample, while another may start with 105 mg. The 1997 Report concludes "[a]s Figure 1 demonstrates however, the difference of 5 mg on the absorbance measured is <u>quite significant</u>." (Emphasis added).

FISH & RICHARDSON P.C.

The Honorable Gregory M. Sleet
April 5, 2006
Page 4

C. *Plaintiffs <u>Own</u> Documents Confirm that the Patents' Test Results in Inflated Apparent Amylose Results*

REDACTED

Co-plaintiff National Starch independently researched the test and reached the same conclusion. When Penford attempted to use the European version of the patents-in-suit to oppose a National Starch European patent application, National Starch advised the European Patent Office that the "measurements of amylose content contained in [the patents-in-suit] are flawed and overestimate the amylose content by at least 10%."

The inventors included no data whatsoever in the patents showing side by side testing of their allegedly "new" high amylose seed and starch with any prior art material also tested using the flawed "Blue Value" test method.

REDACTED

REDACTED

As part of the European Opposition, Teresa Capitani, who runs one of National Starch's test laboratories, submitted a sworn Declaration stating she tested Hylon VII using the method of the patents-in-suit and obtained an amylose content of 91.2%. Ms. Capitani further states that she tested another prior art starch made by National Starch, designated "VJR-3," and obtained an amylose content of 119.7% using the "Blue Value" test.

REDACTED

Plaintiffs' *own evidence* overwhelmingly establishes that they did not invent anything new. They simply grew hybrid seed that was the same as the prior art, but tested it using a flawed method that provided greatly inflated apparent amylose results. Their own internal records repeatedly show that

---

[4] National Starch has told the U.S. Patent and Trademark Office in no fewer than five issued patents between 1989 and 2003 that the amylose content of Hylon VII is approximately 70%. Dr. Fergason testified that it was a goal of his breeding program to maintain the amylose content of Hylon VII within a constant range of 70%-79%.

FISH & RICHARDSON P.C.

The Honorable Gregory M. Sleet
April 5, 2006
Page 5

when tested side by side with the prior art – whether using the "Blue Value" test or more reliable apparent amylose tests – the patented seed and starch is the same as prior art seed and starch such as Hylon VII.

## II. Willfulness

Measured by standard test methods, since the 1960's Cargill's high amylose starch has always fallen within an amylose content range of 65%-75%. Cargill has always represented to customers that its starch contains 70% amylose. Cargill's prior supplier represented the seed as "Class 7" (70% amylose) seed. Cargill's current development contract with the AgReliant seed company specifies development and supply of 70% amylose hybrid seed. Cargill at no time had any reasonable concern that its seed or starch contained amylose in the 80 or 90 percent ranges. Moreover, in light of Plaintiffs' withdrawal of their infringement claims as to the starch patent, their willfulness charge is simply frivolous.

## III. Lost Profits Damages

National Starch lacks standing to seek lost profits based on Cargill's sales of Amylogel 03003

Because National Starch (the only Plaintiff who allegedly had a competing product and suffered lost profits) lacks the requisite rights under the patent, Plaintiffs damages claim is limited to reasonable royalties.

Respectfully,

*[signature]*

Thomas L. Halkowski

TLH:sb/sqm

cc   John W. Shaw (via ECF and hand delivery)
     Monté T. Squire (via ECF and hand delivery)
     Paul M. Richter (via E-mail)
     Jerry Canada (via E-mail)

60349603 (2).doc